J. H. BECK, Plaintiff in Error,

v.

Evelyn Porterfield BECK, J. V. Vanderslice
and Virginia Lee Vanderslice, De-
fendants in Error.

No. 39905.

Supreme Court of Oklahoma.

Feb. 26, 1963.

Thomas E. Shaw, Madill, for plaintiff in error.

Welch & Dudley, Madill, for defendant in error Evelyn Porterfield Beck.

BLACKBIRD, Chief Justice.

This is the second divorce action between plaintiff in error, hereinafter referred to merely as "Beck", and the defendant in error, Evelyn Porterfield Beck, hereinafter referred to merely as "Evelyn". When they first met and were married the same day, March 4, 1960, in his home city of Fort Worth, Texas, Beck was more than seventy years of age and Evelyn was in her early forties, with three minor children by a previous marriage, and living in Rush Springs, Oklahoma, where her parents, the defendants in error, J. V. Vanderslice and Virginia Vanderslice, resided.

About three months after their marriage, or in June, 1960, the couple purchased, for $8,000.00, a large lot with a small dwelling on it, on Caney Creek, in Marshall County, Oklahoma, near Lake Texoma. Their first divorce, on August 22nd of the same year, was obtained on Evelyn's petition alleging incompatibility. By the decree, Beck was awarded the home, determined to have been purchased with his separate funds, and she was awarded $500.00 in alimony, payable in 10 monthly installments. Slightly more than a week later, they signed a joint motion to set the decree aside. On September 9, 1960, Beck borrowed more than $900.00 on his Fort Worth home and gave Evelyn half of this money. (It appears likely that this enabled her to make the five-hundred dollar down payment on a 1957 Model Chevrolet she purchased for $800 or $850, and which auto Beck later traded in on a Ford Station Wagon, after paying the $300 or $350 balance due on its purchase price). The motion to set aside the couple's divorce decree was heard, and sustained, three days later on September 12, 1960.

On the latter date, Beck deeded the east half of the Caney Creek property to Evelyn, and they returned to their home there. Instead of occupying the home in the normal husband-wife manner, however, Beck slept on the screened porch and moved some of his personal belongings to a trailer house parked on the homesite. During the five or six weeks he slept on the porch, he caused certain structural modifications to be made on it that converted part of the porch into an additional room of the residence.

On October 7th, 1960, Evelyn executed and delivered to Mrs. Vanderslice a real estate mortgage on the part of the premises previously deeded to her, as aforesaid. According to its terms, said mortgage was given to secure payment of a five-thousand-dollar loan.

Consistent with the above-mentioned conveyance of the record title to Evelyn of that part of the lot on which the residence was located, Beck accompanied her to his insurance office on October 8, 1960, and, by an endorsement attached thereto, had the insurance policy on the residence changed from naming both of them as the "Insured" (as the policy was originally issued in June) to naming only "Evelyn Beck" as the "Insured".

Thereafter, on January 24th, 1961, Evelyn applied, in her name only, for homestead exemption on the property.

Exactly one year after the couple first met and married, they again separated, Beck taking a few furnishings out of the

aforementioned trailer house, and moving into what he termed a two-room "shack", in Kingston, Oklahoma, where he was residing when this action was tried.

Six days later, or on March 10, 1961, the couple went together to the office of Mr. Beck's attorney, and, while there saw to the execution of two warranty deeds, designed to vest in Beck a life estate in a small parcel of the homesite 17 feet by 31⅔ feet, under, and on three sides of, the aforementioned remodeled porch and bedroom combination. The deed that was executed by both of the parties granted Beck the privilege of using the bathroom facilities in the "adjoining" house. On the same date, before the same attorney as a Notary Public, Mrs. Vanderslice released her aforesaid mortgage as to that small portion of the premises. Also, on the same date, the west one-half of the larger tract (whose record title was still in Beck's name) was conveyed to Mr. and Mrs. Vanderslice by a joint tenancy deed executed by both Evelyn and Beck before the same attorney.

Thereafter, on April 3, 1961, according to Evelyn's testimony, she and Beck concluded another transaction in Beck's attorney's office in which she assigned to Beck the title to the 1958 Model Oldsmobile he had apparently owned when they were married, and she returned to him the wedding rings he had given her. In return, he executed and delivered to her a quit claim deed conveying back the small part of the premises in which, during the month before, she had conveyed to him the life estate, as aforesaid.

When Beck instituted the present divorce action against Evelyn, April 25, 1961, on the ground of extreme cruelty, he named the Vanderslices as additional defendants. His petition alleged, among other things in substance, that his joining Evelyn in having their previous divorce decree set aside, had been induced by her promise to co-habit with him in the usual and normal manner, but that she never intended, and subsequently refused, to carry out this promise, and that therefore the setting aside of the divorce had been induced by fraud perpetrated upon him by her; that his execution and delivery to her of the aforementioned deed to the east half of the Caney Creek property, on the same day he joined her in the motion to set aside the divorce decree, was not for the purpose of making her a gift of said property, but was done in consideration of her said promise to co-habit with him as a normal wife and, as she had refused to fulfill said promise, the deed was void for failure of consideration, and because procured by her said fraud.

As to the hereinbefore described mortgage from Evelyn to Mrs. Vanderslice, Beck's petition alleged that no consideration was paid for it, that it covered part of his homestead, but was executed without his knowledge or consent, and constituted a deliberate attempt to obstruct his regaining title to said property. Beck's petition further alleged that Evelyn had in her possession a 28-gauge Remington Automatic shotgun that was his exclusive property. Beck further alleged, in substance, that he was totally and permanently disabled, unable to earn a livelihood, and was without funds to support himself, or to prosecute the action, but that Evelyn was a young ablebodied woman capable of supporting him and financially able to pay his attorney's fees and the court costs. He prayed, among other things, that Evelyn be ordered to return to him the shot gun and to pay him $100.00 per month as alimony and support money. He further prayed that the Caney Creek property be restored to him, and, in substance, that its title be quieted in him.

In her Answer, Evelyn denied virtually all of Beck's above-described allegations. She specifically denied his assertions that his conveyance to her of the home property had not been a gift and that she had perpetrated any fraud upon him. In the cross-petition accompanying her answer, Evelyn alleged that she and Beck were incompatible, but denied that she had in any way contributed to their incompatibility.

She also alleged that she is the owner of the Caney Creek home and denied that Beck had any right, title, or interest therein. She prayed that she be granted a divorce from Beck, in substance that title to the home be quieted in her, and that she be decreed to be the owner of the aforementioned shot gun, free of any claim of Beck to any right, title, or interest therein. She further prayed that Beck be required to pay her attorney's fee, and that she be granted such other and further relief to which she might be entitled.

The answer of the Vanderslices was, in substance, a general denial of all of Beck's allegations affecting them, or their property rights, except that Evelyn had executed and delivered to Mrs. Vanderslice the aforementioned real estate mortgage. Among other things, they also alleged that the mortgage was executed and delivered for an adequate consideration, and that it constituted a valid and subsisting prior lien on the property it covered.

At the trial of the action, Beck testified (in support of his petition) that Evelyn paid no money consideration for his conveyance to her of the Caney Creek home, when they jointly moved to have their divorce set aside, as aforesaid. He further testified that he executed and delivered the deed to her because "she promised to live with me, and be my wife"; that she did not carry out this promise; that she "had" him build the additional room on the house and that she locked him out of her room many times. Although Beck first testified that Evelyn had, at all times since the divorce was set aside, refused to live with him as a wife, when interrogated, on cross-examination, about specific instances, he admitted that on several occasions they had occupied the same room and bed. Beck further testified, among other things, that he executed and delivered the deed covering the West Half of the Caney Creek tract to the Vanderslices "On" Mr. Vanderslice's promise that he would build a house on it, "* * * and he would straighten her (Evelyn) out, and get her to change her mind." At an-

other point, Beck's testimony concerning that deed was as follows:

"Q You don't claim that that is not a good deed, do you?

"A I guess it's all right. They didn't fulfill their promise to me as they said they would. * * *."

Facts disclosed in Beck's testimony concerning his financial situation, did not establish that he was either without income, or resources, from which to maintain himself.

Evelyn testified, among other things in substance, that she never agreed, in consideration for joining Beck in having the divorce decree set aside, to live with him in all respects as a wife. As she put it, he came to Marlow, Oklahoma, where she had moved and obtained a job, a few days after the divorce, and told her:

"* * * if I would come back and carry his name only that I wouldn't have to live with him, that he would live in a trailer house and besides, give me a deed to the home and give me $100 a month to live on. * * *."

Evelyn testified that when she and Beck returned to the Caney Creek home, after she had accepted his proposition, she refused to occupy the same room with him, and he moved his personal belongings out of the home to the trailer house, and slept on the screened porch. She further testified, however, that, after part of the porch was remodeled into the bedroom, she and Beck slept together in the only bed in it; that she continued to cook the meals for both, and they ate together in the kitchen of the home, all continuing until they separated in March, 1961, when he moved into the trailer house. Evelyn further testified, in substance, that the reason for her conveying to Beck the life estate in the small portion of the premises after their separation, was to give him assurance of having a place to live (he had apparently been accusing her of trying to "run him off", as some of his testimony puts it) and that the consideration for his conveying it back to her approximately a month later, was

her return to him of title to the Oldsmobile and her wedding rings.

Mr. Vanderslice's testimony revealed that he had constructed the house, Beck testified he promised to build on the west half of the Caney Creek property; and he testified to a transaction involving his purchase of Beck's trailer house for more than it was worth, contemplated to show that he had paid Beck an adequate consideration for said parcel, or lot, of land.

At the close of the trial, the court entered a decree finding the issues generally in Evelyn's favor, and granting her a divorce on the ground of incompatibility. The decree also established Evelyn to be the owner of the couple's Caney Creek home, but determined Beck to be the owner of the shot gun. The court further decreed that each of the divorced parties should pay their own attorneys fees, but taxed the costs of the action against Beck. After the overruling of his motion for a new trial, Beck perfected the present appeal. Only he and Evelyn have filed briefs herein.

Under one proposition advanced for reversal of the trial court's decree as it concerns the real estate awarded to Evelyn, Beck argues generally that said decree is not sufficiently sustained by, and is contrary to, the evidence and to the laws of this State. Specifically, he points to an oral remark made by the Judge, after hearing the evidence, to the effect that he was going to hold that Beck *gave* Evelyn the Caney Creek home. Beck argues, in substance, that due to the confidential relationship which unquestionably existed between him and Evelyn, and the economic advantages and benefits she gained by his conveyance to her of said property, she had the burden—which she failed to sustain—of proving that said property was transferred to her as a gift. As the remark by the judge referred to was not incorporated in the decree appealed from, it cannot be used to reverse said decree. See Diem v. Diem, Okl., 372 P.2d 19, 23, and cases there cited.

With reference to the existence of a valid consideration for his conveyance of the home to Evelyn, Beck first challenges the plausibility of Evelyn's testimony that all she agreed to do for said conveyance was "carry his name". He also argues, in substance, that if such was actually the only thing she agreed to do in return for said conveyance, that same was not a "good consideration" therefor, as that term is defined in Title 15 O.S.1961 and 1963, § 106. We believe that when the portion of Evelyn's testimony referred to is viewed in the context of her other testimony, and of the facts it tends to prove, that it was her intention, by using the quoted words, to convey the idea that the promise she gave Beck was to return to him as his ostensible wife in a platonic husband-wife relationship, or as a wife "in name only" as far as sexual matters were concerned. Beck's claim that he was defrauded, or led to believe otherwise, is not substantiated by the undisputed fact that for several weeks, while part of it was being converted into an additional room, Beck slept on the screened porch. If, at the time he deeded the home to Evelyn on September 12th, 1960, she promised to share his bed in consideration therefor, it is passing strange that he waited so long to lodge any complaint about this, and that he continued to cooperate with, and assist, her in acting as the exclusive owner of the property, as herein related, and in trying, with the assistance of his attorney, to "live with" such a domestic arrangement. We cannot say that the trial court's judgment or decree is clearly against the weight of the testimony bearing directly upon the parties' agreement, and we are convinced that it is clearly supported by the weight of the circumstantial evidence. Nor do we think that, in the light of the indicated view of the true import of the parties' agreement, it lacked adequate consideration flowing from Evelyn to her once-divorced husband, Beck. It appears to us as having been contemplated to entail her making a home for him, with the obligation to cook his meals, and to attend to other chores

connected with operating a household. Although contradicted to some extent by Beck, Evelyn's testimony was that she performed such duties from the time she returned with him to the Caney Creek home, until they separated and ceased all semblance of living together. Beck does not contend that if her testimony was worthy of belief (and we think it was) that her assumption of such duties did not constitute a valid consideration, under our statutes, for his conveyance. It may be that at the time he made his proposal to Evelyn, he hoped that sooner or later, after she had resumed living under the same roof with him, they would eventually attain somewhat the same degree of consortium, normal for husbands and wives with less variance in their ages. If this be true, it is plain that such hope never did materialize. An understanding of, or sympathy for, his plight, however, does not restrain us from concurring in the trial court's findings, in effect, that Beck's allegations of Evelyn's fraud were never proved. Neither of the three cases, from which he extracts expressions of this court, and attempts to apply them to this case, are in point. In more recent cases, we have indicated that the "burden of proof" rule applicable to persons in confidential relationships generally, which Beck seeks to have applied here, does not apply with equal force to marital relationships. See McKinney v. Odom, Okl., 363 P.2d 272, quoting from Holliday v. Holliday, Okl., 327 P.2d 456, and McClure v. Kerchner, 107 Okl. 28, 229 P. 589, 594, quoting Schouler on Wills. As to another case in which a relationship of natural affinity was involved, see Higgins v. Pipkin, Okl., 360 P.2d 231, 235. For principles applied to a non-marital relationship, see White v. Morrow, 187 Okl. 72, 100 P.2d 872, 875, 876. Here the evidence is insufficient that Evelyn's influence over Beck was "undue" (within the meaning of that term as used in the rule) or sufficiently different from that quite generally exercised over men by members of the opposite sex with whom they have been associated in a relationship of natural affinity, to have clouded her deed from Beck with a presumption of invalidity, or to have placed upon her the burden of freeing it of such a cloud.

In accord with our foregoing conclusions, the judgment of the trial court is hereby affirmed.