**T. W. IRWIN, Plaintiff in Error,**
v.
**C. IRWIN, Defendant in Error.**
No. 41334.

Supreme Court of Oklahoma.
July 26, 1966.

Miskovsky, Sullivan, Embry, Miskovsky & Turner, Oklahoma City, for plaintiff in error.

Paul L. Washington, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

In this appeal, plaintiff in error, who is defendant in error's former husband, complains of the portions of the parties' divorce decree effecting a division of their property and ordering divided custody of their son, Thomas William, or "Bill".

The parties were married in March, 1943, while plaintiff in error, hereinafter referred to as "defendant", was on active duty in the United States Army. Soon

after he was honorably discharged from the Army, in October, 1945, having suffered wounds for which he has been receiving $58.00 per month in disability compensation, he became employed by a Tulsa insurance company and thereafter continued that employment for ten years. During this period, the couple's daughters, Annette and Carol, or "Jane", were born in 1947 and 1951, respectively; and the family acquired a home at 1703 Carlisle Road, in "The Village", an Oklahoma County municipality.

Beginning in January, 1955, and until January, 1958, defendant worked for another company; and, during the next two years, was unemployed, except for brief periods of employment with four different employers. During this period, plaintiff was teaching in a pre-school, at a salary of $100.00 per month, except when incapacitated on account of the birth of the couple's third and last child, Bill, in October, 1958.

In January, 1960, defendant went to work for R. L. Polk & Company. This job involved traveling between Oklahoma City and Shreveport, Louisiana. Later, before defendant resigned from it, in December, 1960, this job took him to Pampa, Texas, where one Walter Shaller, of Amarillo, was his supervisor. When Shaller visited Oklahoma City, defendant invited him to the couple's home, and introduced him to plaintiff.

During 1961, defendant was again employed away from home, first as a contract commission salesman in Dallas and Albuquerque, then for a business machines company of Wichita Falls. After being out of work around the first of 1962, defendant was again employed by R. L. Polk & Company in February, and part of March of that year, and later, after being unemployed about two months, and hospitalized for 8 days in May, 1962, defendant became employed by a Dallas firm in June of that year. About this time Shaller's Company sent him to Oklahoma City to work for an extended period. In the meantime, his friendship with defendant had progressed to the point that the two rented a cabin, together, at Lake Murray, and, though Shaller had a room at Oklahoma City's Sheraton Hotel, he spent every weekend that summer either in plaintiff's and defendant's home, or with them, and one or more of their children, at Lake Murray. In the latter part of 1962, Shaller reserved cabins at a motel in Okay, Oklahoma, near Ft. Gibson Lake on some weekends, and he, with plaintiff and defendant and one or more of their children, or just with plaintiff and the children, occupied them. There is no evidence that Shaller's wife ever accompanied him to Oklahoma, and presumably she stayed in Amarillo, where, as later revealed, she obtained a divorce from him. On weekdays, while defendant was working in Texas, plaintiff and her children would go to the Sheraton Hotel here and swim in its pool, and have lunch, as the guests of Shaller. Plaintiff admitted that she and the children also went to Shaller's hotel room to use his bathroom, but she denied he ever accompanied them there.

In June, 1963, defendant's employment with the Dallas firm terminated. The same summer, Shaller began doing some work in eastern Oklahoma, and lodging at the Severs Hotel in Muskogee. Before beginning this work, defendant consented to his building a closet to hold some of his belongings in the garage at plaintiff's and defendant's home in The Village, and apparently also, to Shaller's using his home as a forwarding address for mail. That summer, defendant and Shaller reserved a certain "cabin" at an Okay motel for every weekend. It consisted of a combination living room and bedroom, with two beds, a bath, and a screened in porch. Plaintiff and one or more of the couple's children, sometimes unaccompanied by defendant, went there with Shaller, and occupied it periodically. In August, 1963, after being without steady employment most of the summer, defendant resumed work for the Tulsa insurance company. On one occasion, near Labor Day of that year, defendant helped plaintiff pack one of the couple's cars and plaintiff, accompanied by the

couple's young son, Bill, drove to Muskogee, spent a night at the Severs Hotel there, and then traveled with Shaller to the Okay cabin. Defendant was there with them on Labor Day, but then left and plaintiff, her son, Bill, and Shaller, stayed during the remainder of September. That same year, plaintiff aided Shaller by receiving telephone calls in answer to his advertisement in Oklahoma City of an airplane he had for sale.

In October, 1963, plaintiff and defendant apparently agreed to obtain a divorce and defendant took plaintiff to Attorney B, who drafted a verified divorce petition for plaintiff's execution, and, presumably also an entry of appearance and waiver of summons for defendant's execution. Both instruments were executed October 28, 1963, before the same Notary Public. The petition, to initiate the present action, was filed on the same day. Defendant's entry of appearance and waiver was not filed until the following November 26th.

About this time, Shaller's divorced wife telephoned defendant from Amarillo concerning an airplane ticket Shaller had purchased for plaintiff to use in flying to Texas to meet him on or about November 8, 1962 or 1963. Defendant then started an investigation contemplated to reveal plaintiff's relationship with Shaller, but, before this was completed, including his obtaining some unsigned letters he claimed Shaller had written to her, Attorney B was replaced by plaintiff's present attorney, and, on December 2, 1963, a default divorce decree was entered purporting to dissolve the parties' marriage and granting plaintiff all other relief prayed for in her petition.

Without describing all that occurred in the action thereafter, it is sufficient for the purpose of this appeal, to mention that the default decree was thereafter vacated on defendant's motion and he then filed an answer and cross petition, alleging, among other grounds for granting him, instead of plaintiff, a divorce, her adultery; further alleging that she was not a fit and proper person to have the care and custody of the couple's children; and praying, among other things, that her petition be denied and that he be granted a divorce, the children's custody, and an equitable division of the couple's property.

The case finally came to trial in June, 1964. Both plaintiff and defendant introduced evidence concerning each other's associations, during the later years of their marriage, with various members of the opposite sex. Plaintiff testified that on her aforementioned trip to Texas, she met and had dinner with Shaller, but that she left there without spending the night, and she denied having been "intimate" with him. At the trial, the court also heard evidence bearing upon plaintiff's and defendant's suitability and fitness to have custody of the children, pertaining to the couple's property, their indebtedness, their earning capacity, and other material matters.

At the close of the trial, the court entered a decree finding that both parties were entitled to a divorce on the ground of incompatibility, and that plaintiff was a fit and proper person to have the care and custody of the couple's two daughters and son. The decree gave plaintiff exclusive custody of the daughters, with visitation privileges to defendant at appropriate times. As hereinbefore indicated, the care and custody of the 5-year-old son, Bill, was divided, and plaintiff was to have him only during winter school terms, except for two weekends a month, when the boy was to visit defendant. During the summer months of June, July, and August, defendant was to have Bill's care and custody. In the decree, defendant was ordered to pay plaintiff $71.75 per month for the support of the daughters, and an identical sum for Bill's support during each month of the year that he was to be in plaintiff's custody. By way of property settlement and alimony, the decree gave plaintiff the couple's equity in the family home in The Village, with all of its furnishings, and gave defendant the only automobile the couple had left, of the two they owned prior to the divorce, along with certain personal effects, clothing, etc.

857

The decree also required defendant to pay plaintiff's attorney fee of $250.00, and the court costs. After the overruling of his motion for a new trial, defendant perfected the present appeal.

In his first proposition for reversal, defendant contends that the trial court abused his discretion in his provisions for Bill's custody. His counsel say the "evidence is overwhelming" that plaintiff "carried on an adulterous course of conduct" with Walter Shaller; and that the trial court "so found" in his oral remarks at the time of announcing his judgment. Premised on the correctness of these statements of theirs, counsel say this conduct rendered plaintiff an unfit person for the boy's custody, citing, and/or quoting, several cases from other jurisdictions. In most, if not all, of these cases, fathers were granted divorces on account of their wives' adultery. In Shrout v. Shrout, 224 Or. 521, 356 P.2d 935, principally relied on, the court said, among other things, that any moral transgression of the mother, along with other relevant factors, must be considered in determining what is best for the children in the matter of their custody. We agree with that statement, but we do not agree with counsel's statements concerning the evidence in this case; nor can the trial judge's insinuating remarks concerning plaintiff's conduct be considered to vary, contradict, or reverse his judgment containing the specific finding of plaintiff's fitness for the care and custody of her children, including the son, Bill. In the latter connection, see Beck v. Beck, Okl., 379 P.2d 672, 676, and Moree v. Moree, Okl., 371 P.2d 719. As said in Holliday v. Holliday, Okl., 327 P.2d 456, 462: "Said court's closing oral remarks, in rendering the judgment, quoted in appellants' brief, even if germane to any of the issues, would serve no effective purpose in their attempt to reverse it." No such remarks or statements were incorporated in the divorce decree's journal entry (see Ralston v. Tucker, Okl., 324 P.2d 525, 529) which bears the "O. K. as to Form" of

defendant's counsel; and the only ground the decree mentioned for granting the divorce was the one of the parties' incompatibility. In this connection, notice also In re Warwick's Estate, Okl., 291 P.2d 346, 349.

We have not attempted to relate all of the numerous facts and circumstances to which defendant's counsel call our attention, as tending to indicate an improper relationship between plaintiff and Walter Shaller, but we have thoroughly weighed them against all of the other evidence concerning this relationship, including plaintiff's positive denials of the elements of marital infidelity on her part, as well as the claimed letters from Shaller to her, which the trial judge viewed as *not* showing adultery and we have concluded there is ample basis for a difference of opinion among reasonable minds as to whether there was any more than a platonic, or non-amatory, friendship between these parties. Adultery, like rape and bribery, is easy to charge but often difficult to prove. Such offenses are usually committed in private, with no eyewitnesses, except the participants. On re-direct examination, the defendant himself admitted that he did not know what his wife's relationship with Shaller had been, and he expressly conceded on direct examination, that: "For 19 years * * * (plaintiff) was a fine wife and mother to the best of my knowledge * * *." Testimony from friends, and/or neighbors, of the couple contains evidence of conduct indicating that plaintiff is still a good mother and has the best interests of her children at heart.

Plaintiff's counsel call our attention to the statutory preference given mothers of children of tender years, in the matter of their custody, " * * * other things being equal, * * *." Tit. 30 O.S. 1961, sec. 11. In Hurt v. Hurt, Okl., 315 P.2d 957, 959, which involved custody of an eight-year-old boy, this court said:

"It is generally recognized that the mother is a natural custodian of her

child of tender years, and that if she is a fit and proper person other things being equal, she should be given custody in order that the child may receive the attention, care, supervision, and kindly advice, which arises from a mother's love and devotion, *for which no substitute has ever been found.*" (Emphasis added).

In Kuykendall v. Kuykendall, Okl., 290 P. 2d 128, 130, we quoted from Bruce v. Bruce, 141 Okl. 160, 285 P. 30, 37, the following statements, among others:

" * * * Courts know that mother love is a dominant trait in the heart of a mother, even in the weakest of women. It is of divine origin, and in nearly all cases far exceeds and surpasses the parental affection of the father. Every just man recognizes the fact that minor children need the constant bestowal of the mother's care and love. It is for these reasons courts are loath to deprive the mother of the care and custody of her children, and will not do so, as above remarked, *unless it clearly appears that she is an improper person to be intrusted with their care and custody.*" (Emphasis added).

Defendant's testimony indicated that if the trial court gave him custody of the children, his childless sister-in-law would "stay as a housekeeper during the daytime", but there was no other evidence of that person's identity and none of her suitability for attempting to help defendant furnish the children care and supervision. From defendant's testimony, it appears that the only reasons he had for being apprehensive about his young son's welfare in plaintiff's custody arose out of her association with Shaller, but the trial judge let it be known that the court's continuing jurisdiction over the boy's custody could be a deterrent to his welfare suffering from that. We think, after carefully examining the entire record, there can be no other question about Bill's best interests and welfare being served by living with his mother, at least during school terms and while he is of tender age; and we believe, on the basis of the evidence that the danger that this boy will be detrimentally affected by a future association between his mother and Shaller is more fancied, and partisan-inspired, than real. We have concluded that this case is a proper one for application of the above mentioned statutory preference of the mother (as it pertains to children of tender years) and of the rule which requires it to *clearly appear* that she is "an improper person", before being deprived of that preference. As the evidence in this case falls short of that degree of proof, and the trial court's decree, as to the custody of Bill, cannot be held to be clearly against the weight of the evidence, defendant's arguments under his first proposition present no cause for modification, or reversal, of said decree. In this connection, notice Bell v. Bell, 196 Okl. 130, 163 P.2d 548, 550.

■■■■ As his "PROPOSITION II", defendant contends the trial court abused its discretion in the division of the parties' property. It is obvious that the parties' jointly acquired property, which consisted principally of their home and furnishings, was not divided equally, from the standpoint of value. It is also obvious that the decree did not order the plaintiff to pay defendant any sum of money to offset this comparatively greater value accruing to her from being awarded the couple's approximately $5200.00 equity in their $10,000.00 home, together with furnishings. Defense counsel say that in such property division, Tit. 12 O.S.1961, sec. 1278, and the case of Tobin v. Tobin, 89 Okl. 12, 213 P. 884, were not followed, but they do not make it clear in what respect they claim this is true. A reading of the opinion in the cited case makes it manifest that the expression "fair and just division" in that portion of the cited statute dealing with the parties' jointly acquired property is not synonymous with "Equal division", and that the court, in effecting a fair and just division is not required to equalize the division, in value, or offset the value

of property awarded one of the parties in kind, by ordering him or her to pay the other a sum of money. But here, the divorce, as hereinbefore noted, was granted to both of the parties, in which case sec. 1275 of Title 12, supra, is controlling. Said statute, in pertinent part, reads as follows:

> "The parties appear to be in equal wrong shall not be a basis for refusing to grant a divorce, but if a divorce is granted in such circumstances, it shall be granted to both parties. In any such case * * * the court may for good cause shown make such order * * * for the control and equitable division and disposition of the property of the parties, or of either of them, as may be proper, equitable and just, having due regard to the time and manner of acquiring such property, whether the title thereto be in either or both of said parties."

In the present case, the decree's award of the parties' home to plaintiff carried with it the mortgage indebtedness upon it of approximately $4800.00. The brief of defendant represents that he owes $3065.00, but we notice from the list of his debts appearing in the record as defendant's Exhibit No. 20, some of the items going to make up that total are indicated to be for taxes and payments due on the home, for whose payment plaintiff, as we interpret the decree, is made responsible. The evidence tends to show, indirectly at least, that plaintiff's efforts played a part in the accumulation of the parties' equity in the home and more specifically, that had it not been for her earnings as a teacher, the parties would not have been able to meet their household and essential living expenses, especially during the periods of defendant's unemployment. Furthermore, without this furnished home, providing the children a place to live, the expenses of supporting them—for which defendant, as their father, is legally responsible—might be considerably increased. We have carefully examined the evidence pertinent to defendant's contentions concerning the property division, and, on the basis thereof, cannot say that the trial court abused its discretion in that matter. That portion of the decree appealed from will therefore not be disturbed.

 Under defendant's third and last "PROPOSITION", he says the trial court erred in excluding "an official take off of the court record in the trial of the Shaller v. Shaller divorce case." His counsel say this document would have established " * * * dates of various phases of * * *" that trial " * * * and tie into incidents that were transpiring between Shaller and the plaintiff." The record discloses that such an instrument was marked "Defendant's Exhibit 7" for the purpose of identification, and that after plaintiff's counsel's objection to its introduction into the evidence had been sustained, defendant's attorney stated: "Let the record show we offer that for the record." Our examination of the case made before us, however, fails to disclose any such exhibit, and in its absence, we cannot rule upon the alleged error in excluding it. See Offutt v. Wagoner, 30 Okl. 458, 120 P. 1018.

 Defendant also contends that the trial court erred in excluding from the evidence a document marked "Defendant's Exhibit 8", and indicated in the case made to be Walter Shaller's application to register as a voter in Oklahoma County, purportedly subscribed to by him on July 29, 1963, and representing, among other things, his address to be "1703 Carlisle Road", and that his residence in Oklahoma began "April 1, 1962." In refusing admission of this documentary evidence, the trial court indicated that he was taking judicial notice of, and finding, that Shaller claimed to be registered to vote from that address. Defense counsel's only statement supporting the claim of error in this exclusion is the statement: "It is submitted that it (the exhibit) had probative value in connection with the activities of Shaller and the plain-

tiff." This statement is insufficient to demonstrate any error on the part of the trial court, under the circumstances. We therefore express no opinion upon this claim of error. See Missouri, Kansas & Texas Railroad Co. v. French, Okl., 368 P.2d 652.

▮▮▮▮ Defendant finally contends that the trial court erred in refusing to let him interrogate, on cross examination, one of plaintiff's witnesses, whose testimony was contemplated to show, among other things, that she had been a good mother. The entire record, with reference to this matter, is depicted in the following excerpt therefrom:

"MR. MISKOVSKY: You have had some drinking problems, have been arrested and paid fines for drunkenness, haven't you?

"MR. WASHINGTON: Now, if the court, please, that is incompetent, irrelevant and immaterial.

"THE COURT: I don't care what his record has been.

"MR. MISKOVSKY: Just test his credibility as a witness.

"THE COURT: I don't care about that, Mr. Miskovsky.

"MR. MISKOVSKY: All right, that will be all."

As will be observed from the above, the record is insufficient upon which to predicate this claimed error. See McMillan v. Lane Wood & Co., Okl., 361 P.2d 487, and the discussion in cases cited at page 490 thereof, and In re Cully's Estate, Okl., 276 P.2d 250, 255, as referred to in Myers v. Diehl, Okl., 365 P.2d 717, 722.

As we have found in defendant's arguments no cause for reversing the decree and judgment appealed from herein, it is hereby affirmed.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN, BERRY and LAVENDER, JJ., concur.