Larkin BAILEY and Elsie S. Bailey, Husband and Wife, Plaintiffs in Error,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF HIGHWAYS of the State of Oklahoma, Defendant in Error.

No. 41623.

Supreme Court of Oklahoma.

Jan. 30, 1968.

Spillers & Spillers, Tulsa, for plaintiffs in error.

John Paul Walters and Court Pappe, Jr., Dept. of Highways, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action instituted by the defendant in error, hereinafter referred to as "plaintiff", to condemn a Tulsa vacant lot belonging to plaintiffs in error, hereinafter referred to as "defendants" for the purpose of widening a highway right-of-way to make room for construction of a so-called "Crosstown Bypass" or "Expressway" across said City.

The lot is located in the northeast part of the intersection of Archer Street and Sheridan Road. Its dimensions are 55 feet by 630 feet, with its 55-foot side facing Sheridan Road and its 630-foot side facing Archer Street. All of the western end of the lot, to a point 75 feet inward, or eastward, from Sheridan Road, has been zoned for offstreet parking, prohibiting (unless rezoned) the construction of any permanent structure thereon. The remainder of the lot is in a "U-3 A", or "light industry", zone.

The report filed by the Commissioners appointed by the court evidenced their assessment of defendants' damages from plaintiff's taking of the lot, at $10,409.00; and, thereafter, both plaintiff and defendants filed demands for a jury trial.

At the trial, it was shown that a gully, or depression, traverses the entire length of the lot, with the result that its east end is as much as 15 feet lower than portions of its west end. This depression has been partially filled, over a period of years, with discarded rock, dirt, rubble and other "dump yard" material.

One of the defendants, Larkin Bailey, testified that it would not be an "expensive or a difficult matter" to level off the lot and "make it appropriate for commercial uses." Said defendant, who testified that he has been in the abstract business in Tulsa since January, 1928, and professed to be "acquainted * * * generally with real estate matters" in said City, further testified that the lot could be used as a site for "most any retail establishment" and that, in his opinion, the lot's 34,640 square feet was worth $1.00 per square foot, or a total of $34,640.00. This witness, who testified on cross examination, over defense counsel's objection, that he owns approximately 90 other "tracts" in Tulsa County, also testified that the next street intersection north of the one involved here, on Sheridan Road (which is a heavily travelled traffic artery) is 1400 feet from this one. On direct examination, this witness was asked: "* * * what is the situation north of this property, as to what it's being used for at the present time?" Counsel for plaintiff forestalled any answer to this question with an objection, and defense counsel thereupon disclosed that he contemplated asking the witness about the other land north of this lot "to see if it's comparable to this, and whether or not it could be utilized together." When the trial judge indicated that such a use was not a proper element to be considered in arriving at the lot's value, defense counsel added: "It's the key to the whole thing."

Thereupon, defense counsel made the following offer, out of the hearing of the jury: "If this witness were permitted to answer the question * * * he would state that this property is the key to large scale development of the property adjacent to and lying north of it, over a substantial area, and has a value for that purpose."

One of the defendants' expert witnesses, a realtor, Mr. M, estimated the western part of the lot, from Sheridan Road to a point 330 feet east of that street, to have a value of $1.00 per square foot (which he said was the "going rate at Tulsa for commercial purposes") or a total value of $16,500.00, and the remaining eastern 330-foot expanse of the lot along Archer Street, to have a value of 40¢ per square foot, or $7,260.00, making the whole lot worth a total of $23,763.00. When defense counsel asked this witness to tell "what other considerations, if any, * * * entered into" his "calculation", the court sustained plaintiff counsel's objection to the following answer given by said witness:

"A. Well, looking at this property as a whole piece of property, and we look at it as a realtor selling it to an investor, or a user, he would look at all the property and the first thing he would see he could utilize this first 300 feet to a real good advantage, and I can utilize this at a cost of $23,760.00 by any project I put on that 300 feet, and the rest is gravey. If I make money on the Industrial, then I * * *."

Plaintiff's expert witness, Mr. P, testified that defendants' damages from the taking of the lot would be $8,675.00. His testimony showed that, in arriving at this figure as the value of defendants' lot, he took into consideration the sales of other Tulsa properties, including one on Archer Street, a block west of the subject one, which sold, in 1962, for an "indicated" price of 25 cents per areal square foot, and another, referred to as the "Brown", which sold in 1961, and thereafter became the site of a part of Tulsa's "Jubilee Shopping Center", for a price of 35¢ per

square foot. He testified that this shopping center begins a block east of the subject lot, and occupies an area from Archer Street to Admiral Boulevard.

During Mr. P's cross examination, he revealed that the first above mentioned property was zoned only for residential uses at the time of its sale. After eliciting from this witness that this meant that nothing commercial could be put on it, other than a duplex, the witness' cross examination continued as follows:

"Q. That's right. And it's not always an easy thing to get something rezoned here in this town.

"MR. PAPPE: Now, I am going to object.

"BY THE COURT: Yes, sustained."

After this witness' testimony showed that, in arriving at his appraisal of the subject property, he had considered the price that several other additional properties, along the route of the proposed expressway, had previously sold for, defense counsel asked him if he knew "when this Expressway was (publicly) announced"; and the following ensued:

"MR. PAPPE: I am going to object to that, your Honor.

\* \* \* \* \* \*

"BY THE COURT: That has nothing to do with this.

\* \* \* \* \* \*

"OFFER OF PROOF OUT OF THE HEARING OF THE JURY:

"BY MR. SPILLERS: Comes now the defendant, and offers * * * to prove, if this witness * * * were permitted to testify, and if I were permitted to ask when this Expressway was announced, * * *

"MR. PAPPE: Now, your Honor, I am going to object to this.

\*. \* \* \* \* \*

"MR. SPILLERS: Comes now the defendant and offers and tenders to prove that if this witness, if I were permitted to ask the witness when this Express-

way through this area was first announced that the witness would state it was at least three years before the taking of the property in controversy, and that all of these so-called comparable sales in the vicinity are sales predicated upon the fact that the announcement of the expressway going through the area made it * * * depress all sales values in the area, more or less stagnated the property, because no one wanted to buy property under these circumstances.

*    *    *    *    *    *

"BY THE COURT: The objection to the offer will be sustained.

"MR. SPILLERS: Exception. * * *."

Other excerpts from Mr. P's testimony are as follows:

"Q. There are many small businesses that could go in there in a shopping or business complex?

"A. Except for competition in that area.

"Q. Well, there's competition in every area?

"A. Competition is close there, very close there, with that Abshire village across the street southeast, you have Sheridan Village a block south, you have that new shopping center up north there in the 800 block, and across the street you have a new bowling alley, liquor store. That has taken the play away from this particular area.

*    *    *    *    *    *

"Q. Well now, let's just go into leveling and preparing this ground. There isn't much to putting a bulldozer in there and preparing, and leveling the ground up in proper fashion, is there?

"A. Well, yes, there's quite a little bit to it, from personal experience, I am speaking.

*    *    *    *    *    *

"A. My judgment is that it would take about an average four foot fill across that property. I believe I have estimated the number of cubic yards of dirt that would go in there. The Area has ap-

proximately 36,450 feet, with an average fill of four feet it would take 15,400 feet, of dirt. At 20 cents a cubic yard, it would be in excess of $3,000.00 for the dirt alone. * * *."

The record in this case indicates that, after the close of the evidence, the jury went, in a body, to personally view the property. After it returned to the court room, and the case was submitted to it, under the court's instructions, a verdict fixing the amount of defendants' recovery at $9,000.00 was returned; and judgment was rendered accordingly. After the overruling of their motion for a new trial, defendants lodged the present appeal.

■ In opening their argument for reversal, defendants "assert that the verdict of the jury was contrary to the great weight of the evidence and unsupported thereby * * *". This court does not weigh the evidence in condemnation cases. In City of McAlester v. Delciello, Okl., 412 P.2d 623, we said:

"The amount of damages awarded defendants for condemnation of their property and the abutter's right to access to the land, was well *within the permissible limits disclosed by the opinion testimony of witnesses whom the trial court found qualified to testify.* The weight and credibility of the expert opinion testimony was for the jury to determine. In such cases *the unvarying rule* applied is that stated in syllabus 2 of Oklahoma Turnpike Authority v. Daniel, Okl., 398 P.2d 515:

" 'This court will not substitute its judgment for that of a jury in matters of damages to be awarded for the condemnation of property for a public use, nor will it disturb the verdict of a jury *if supported by any competent evidence.*' " (Emphasis added).

See also Arkansas Louisiana Gas Co. v. Ackley, Okl., 410 P.2d 35, Eberle v. State Department of Highways, Okl., 385 P.2d 868, Allen v. City of Tulsa, Okl., 345 P.2d 443, 447, and other cases digested in 6A Okl.Dig., under "Eminent Domain" ■

■ As the verdict in this case, like those in the cited cases, was for an amount within the range indicated by the conflicting testimony of the plaintiff's and defendants' expert witnesses, it cannot be held to be without competent evidence to support it.

■ In seven numbered paragraphs, or portions of their brief, defendants assert error in the hereinbefore shown rulings of the trial court as follows:

(1) Sustaining plaintiff's objection to the defendant Bailey being allowed to testify about the present use of the property north of the subject lot, and, more particularly, that the latter is the "key" to the development of that property "and has a value for that purpose." Also refusing to allow defendants' witness, Mr. M, to testify that the property north of said lot is "comparable to the property referred to as 'Jubilee Shopping Center' property, * * *".

(2) Sustaining plaintiff's objection to defense counsel being allowed to elicit from defendants' witness, Mr. M, and in allowing plaintiff's witness, Mr. P, to testify, as to when the contemplated building of the Crosstown Expressway was publicly announced; and sustaining plaintiff counsel's objection to defendants' offer of proof, in substance, that said announcement had the effect of depressing "sales values in the area * *".

(3) Not allowing defendants' witness, Mr. M, to continue his hereinbefore quoted testimony in answer to defense counsel's question concerning the "considerations" that entered into his opinion as to the value of the subject property.

(4) Sustaining plaintiff counsel's objection to defense counsel's hereinbefore quoted "question" of Mr. P concerning difficulty encountered in getting property in Tulsa rezoned.

(5) The overruling of defense counsel's objection to plaintiff counsel's questioning the defendant, Bailey, as to his ownership of other Tulsa property besides the subject lot.

As to (5) above, plaintiff argues, in effect, that the defendant Bailey's revelation that he owned 90 tracts in Tulsa County was not an error prejudicial to defendants, because it "only went to strengthen him as a witness on his own behalf by showing his knowledge and skills in real estate values by virtue * * * (of such extensive ownership)." Reference to the case-made reveals that at the outset of the trial judge's rulings on defense counsel's challenges to the materiality of this line of questioning, the trial judge expressed the opinion that such testimony " * * * goes to (the witness') knowledge of values." As this defendant testified in the manner of an expert witness on Tulsa real estate values, and seems to have been regarded at the trial as such, we are inclined to agree with the trial judge; and we find no basis for attributing to said court's ruling on defense counsel's objections, the prejudicial effect defendants attribute to it.

■ Defendants' other contentions of error referred to above as (1) to (4), both inclusive, are no more than bare assertions, unaccompanied either by convincing argument, or the citation of authority, to support them. Nor is it apparent, without research, that they are tenable. Under the well settled rule of appellate review followed in Irwin v. Irwin, Okl., 416 P.2d 853, and numerous other cases digested in 2A Okl. Dig. "Appeal & Error" ■ we will not consider these assertions.

As defendants have failed to demonstrate reversible error in the trial of this case, the judgment of the trial court is hereby affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, and HODGES, JJ., concur.

BERRY and LAVENDER, JJ., concur in result.